# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JACQUELINE C. NEAL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 13-1978-SLR |
| | ) |
| CAROLYN W. COLVIN, Commissioner, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

Sommer L. Ross, Esquire, of Duane Morris, L.L.P., Wilmington, Delaware. Of Counsel: Eddy Pierre Pierre, Esquire, of the Law Offices of Harry J. Binder and Charles E. Binder, P.C., New York, New York. Counsel for Plaintiff.

Charles M. Oberly, III, Esquire, United States Attorney, District of Delaware, and Patricia A. Stewart, Esquire, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania. Of Counsel: Nora Koch, Esquire, Acting Regional Chief Counsel, and Rafael Melendez, Esquire, Assistant Regional Counsel, Office of General Counsel, Social Security Administration, Philadelphia, Pennsylvania. Counsel for Defendant.

## MEMORANDUM OPINION

Dated: March $26$, 2015
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Jacqueline Neal ("plaintiff") appeals from a decision of Carolyn W. Colvin, the Commissioner of Social Security ("defendant"), denying her application for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. The court has jurisdiction pursuant to 42 U.S.C. § 405(g).[1]

Pending before the court are the parties' cross-motions for summary judgment. (D.I. 13, 15) For the reasons set forth below, plaintiff's motion will be denied and defendant's motion will be granted.

## II. BACKGROUND

### A. Procedural History

Plaintiff filed an application for SSI on December 22, 2010, alleging disability beginning on December 6, 2010, due to "post-traumatic stress disorder ('PTSD') and bipolar disorder." (D.I. 14 at 2; D.I. 11 at 21) After a hearing on March 25, 2013, the ALJ issued a decision on May 13, 2013 ("the 2013 decision") finding that plaintiff was not disabled. (D.I. 15 at 1) Plaintiff appealed to the Appeals Council, which issued an unfavorable opinion on May 24, 2013. (Id.) On November 26, 2013, plaintiff filed the present action for review of the 2013 decision.

### B. Medical History

#### 1. Mental health history before the relevant time period

---

[1] Under § 405(g), "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision. . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . ." 42 U.S.C. § 405(g).

Plaintiff was born in 1961 and was 49 years old on her alleged onset date. (D.I. 14 at 2) She is considered a younger individual under 20 C.F.R. 404.1563(c). Plaintiff has an 11th grade education and no past relevant work experience. (D.I. 11 at 33, 239) Plaintiff has been receiving treatment from Dr. Patricia Lifrak ("Dr. Lifrak"), a psychiatrist, since June 2008 (D.I. 11 at 320) and Dr. Samuel Romirowsky ("Dr. Romirowsky"), a licensed psychologist, since September 2009. (Id. at 62, 478) The doctors have been coordinating their treatment efforts. (Id. at 62)

On June 2008, Dr. Lifrak first met with plaintiff and diagnosed her with Bipolar II Disorder. (Id. at 319-20) Dr. Lifrak's treatment note from that appointment indicates that plaintiff had grossly normal memory and cognition, fair judgment and insight, a logical and goal directed thought process, and that she had denied suicidal or homicidal ideation. (Id.) Dr. Lifrak indicated that plaintiff's global assessment of functioning (GAF) score was 65-70.[2] (Id.) She prescribed various medications to treat plaintiff's condition. (Id.) On January 22, 2010, Dr. Lifrak reported that plaintiff was "stable on meds," "doing well," and her sleep was good. (Id. at 302) In September 2010, Dr. Romirowsky met briefly with plaintiff and noted

---

[2] "Global functioning or global assessment functioning scores are used by mental health clinicians and doctors to rate the social, occupational and psychological functioning of adults." Irizarry v. Barnhart, 233 F. App'x 189, 190 n.1 (3d Cir. 2007). "The GAF scale ranges from 1 to 100, with a score of 1 being the lowest and 100 being the highest." Rios v. Comm'r of Soc. Sec., 444 F. App'x 532, 534 (3d Cir. 2011). "A GAF score of 41–50 indicates an individual has serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF score of 51–60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning." Id. (internal citations omitted). A GAF of 61-70 indicates "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . , but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders (Text Revision, 4th ed. 2000).

that she was "very agitated" and was "too fearful to talk." (*Id.* at 485) His notes reflect that plaintiff was frustrated her medications had not been helpful. (*Id.*) Dr. Romirowksy diagnosed plaintiff with post-traumatic stress disorder and bipolar disorder and recommended future appointments as necessary. (*Id.* at 485)

## 2. Mental health history after the relevant time period

On December 8, 2010, plaintiff met with Dr. Lifrak and complained that Seroquel[3] had caused weight gain. (*Id.* at 306) Dr. Lifrak replaced the Seroquel prescription with Topamax.[4] (*Id.*) Dr. Lifrak noted that "Celexa helped with her depression" and that she denied suicidal and homicidal ideation.[5] (*Id.*) Dr. Lifrak continued prescribing Celexa and Klonopin.[6] (*Id.*) On February 24, 2011, Dr. Romirowsky's consultation note indicates that plaintiff reported feeling "very anxious" and having panic attacks. (*Id.* at 326) During this time, Dr. Romirowsky helped plaintiff complete a Function Report. (*Id.* at 245-52) The report stated that plaintiff drove and visited her mother, but preferred not to shop for herself and rarely went outside due to panic attacks. (*Id.* at 248) It listed plaintiff's hobbies as watching television and crocheting. (*Id.*)

On March 22, 2011, plaintiff reported to Dr. Romirowsky that she felt "very agitated" and had "angry outbursts." (*Id.* at 486) In April 2011, Dr. Romirowsky noted that plaintiff

---

[3] Seroquel is used to treat bipolar disorder (manic depression) in adults. *See* http://drugs.com/seroquel.html (last visited Mar. 10, 2015).

[4] Topamax is an anticonvulsant used to treat seizures and migraine headaches. *See* http://drugs.com/topamax.html (last visited Mar. 10, 2015).

[5] Celexa is an antidepressant. *See* http://drugs.com/celexa.html (last visited Mar. 10, 2015).

[6] Klonopin affects chemicals in the brain that may become unbalanced and cause anxiety. *See* http://drugs.com/klonopin.html (last visited Mar.10, 2015).

continued to experience persistent anxiety. (*Id.* at 325) On May 2, 2011, Dr. Lifrak reported that plaintiff had to stop taking Topamax due to nose bleeds, but again recorded that she did well on Klonopin and Celexa. (*Id.* at 330) Plaintiff denied suicidal and homicidal ideation and explained that she feels depressed without her medications. (*Id.*) Dr. Lifrak started plaintiff on Trazodone.[7] (*Id.*) Later in May 2011, Dr. Lifrak noted that the Trazodone made plaintiff depressed, suicidal, nauseated, and agitated, and discontinued that prescription. (*Id.* at 329) Dr. Lifrak replaced that prescription with Depakote.[8] (*Id.*) In July 2011, Dr. Lifrak indicated that plaintiff's progress had "improved." (*Id.* at 328) The treatment note states that she was "doing better, feels better, [is] calmer, [and] denies depression, suicidal thoughts" and homicidal ideation. (*Id.*) On August 17, 2011, Dr. Romirowsky noted that plaintiff was still upset, agitated, and depressed, and was fearful to leave her home. (*Id.* at 480)

In September 2011, plaintiff completed a second Function Report. (*Id.* at 260-67) She noted that she lives with friends in an apartment and periodically checks in on her mother. *Id.* She indicated that she cannot sleep without medication. (*Id.* at 261) She reported that she has no problems with personal care, cooks for herself daily, completes housework, rarely leaves her house, is able to pay bills and handle accounts, and socializes with others by playing cards and dominos, and watching television. (*Id.* at 260-64) In December 2011, plaintiff continued experiencing "extreme anxiety" and was "very volatile." (*Id.* at 338) In February 2012, plaintiff again reported to Dr. Romirowsky that she was highly

---

[7] Trazodone is an antidepressant. *See* http://drugs.com/trazodone.html (last visited Mar. 10, 2015).

[8] Depakote is used to treat manic episodes related to bipolar disorder and to prevent migraine headaches. *See* http://drugs.com/depakote.html (last visited Mar. 10, 2015).

4

anxious, mistrustful of others, and continuing to experience panic attacks. (*Id.* at 340) He wrote that plaintiff needed to attend counseling more regularly. (*Id.*)

On December 9, 2012, Dr. Romirowsky completed a Pyschiatric/Psychological Impairment Questionnaire and diagnosed major depressive disorder, post-traumatic stress disorder, and dependent personality disorder. (*Id.* at 341) He assessed a GAF score of 40 and a "poor" prognosis. (*Id.*) The Questionnaire also documented that plaintiff suffered from poor memory, sleep disturbance, mood disturbance, emotional liability, recurrent panic attacks, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, paranoia or inappropriate suspiciousness, difficult thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, intrusive recollections of a traumatic experience, persistent irrational fears, generalized persistent anxiety, and hostility and irritability. (*Id.* at 342) Dr. Romirowsky opined that plaintiff would be incapable of tolerating even low stress work. (*Id.* at 347)

Dr. Romirowsky indicated that plaintiff was markedly limited in her ability to remember locations and work-like procedures; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerance; sustain ordinary routine without supervision; work in coordination with or proximity to others without being distracted by them; complete a normal work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; be aware of normal hazards and take appropriate precautions; travel to unfamiliar places or use public transportation; and set realistic goals or make plans

5

independently. (Id. at 344-46) He indicated that plaintiff was moderately limited in her ability to understand and remember one- or two-step instructions. (Id. at 344)

On May 11, 2011, Aroon Suansilppongse, M.D., a state agency physician, reviewed plaintiff's medical evidence record and completed a Psychiatric Review Technique assessment. (Id. at 115-16) Dr. Suansilppongse reported that plaintiff's affective and anxiety-related disorders resulted in mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning and concentration, persistence, or pace, and one or two repeated episodes of decompensation, each of extended duration. (Id. at 115) Dr. Suansilppongse reported that the evidence did not establish the presence of the "paragraph C" criteria of Medical Listings 12.04 or 12.06. (Id.) After reviewing the medical evidence record and a July 2009 psychological consultative examination report, Dr. Suansilppongse completed a Mental Residual Functional Capacity assessment and reported that plaintiff could perform simple work with infrequent contact with the public. (Id. at 116-20)

At the administrative hearing, Dr. Romirowsky testified that plaintiff remained "highly anxious, actually sort of on the border of decompensation on a day-to-day basis, sometimes just on the healthier side of decompensation, but still with extreme debilitating anxiety and agitation." (Id. at 62) He opined that plaintiff met the criteria of Medical Listing 12.04 and 12.06 as described in the Social Security regulations. (Id. at 64, 69)

## C. Administrative Hearing

### 1. Plaintiff's testimony

The administrative hearing took place on March 25, 2013. Plaintiff appeared, represented by counsel. (Id. at 43) Plaintiff was 51 years old at the time of the hearing. (Id. at 44) She has not worked since December 6, 2010. (Id. at 46) At the time, plaintiff lived with her friend and her friend's husband. (Id.) She testified that she worked up until

6

the date of onset, but had been fired from several jobs. (*Id.* at 47) She explained that her condition caused her to experience depression, suffer panic attacks when around other people, and not be able to control her attitude. (*Id.* at 51) Plaintiff described her personality as fine one minute, but would "fly[] off the handle" the next. (*Id.* at 47) In her opinion, this behavior led to her several job terminations.

She first worked at "Transport Command" from 1998 to 2008 as a dishwasher, a host, and a waitress. (*Id.* at 49) From 2008 to 2009, she worked as a machine operator for a temporary service. (*Id.*) She then worked at Popeye's, making biscuits and doing dishes. (*Id.*) After she left that job, she worked at Church's Village, a nursing home, where she took care of patients and cleaned. (*Id.*) Plaintiff stated that, presently, her only source of income was Medicaid and food stamps. (*Id.*) She is single and has no children. Plaintiff stopped driving about four years prior to the hearing and no longer has a license. (*Id.* at 51-52) She uses public transportation. (*Id.* at 52) She testified that she does all her own cooking, cleaning, laundry, and shopping. (*Id.*) She prefers to grocery shop in the middle of the night when the stores are not crowded. (*Id.*) In her spare time, she "like[s] to take her [roommate's] pet to the park" and "do[es] a lot of walking." (*Id.* at 53) She "visit[s] [her] mother" in Newark, but "do[es not] do a lot of socializing with people." (*Id.*) She smokes approximately three cigarettes a day. (*Id.*)

While she "ordinarily" takes medication, plaintiff discontinued her medications three months prior to the hearing, due to affordability concerns. (*Id.* at 54-55) However, she has a medical card, which pays for almost all of the cost of the medication except for $5 or $10. (*Id.* at 55) Plaintiff testified that she had not taken her medications on the date of the hearing. (*Id.* at 48) She stated that she intends to eventually resume taking the medications. (*Id.* at 56) She testified that life is "about the same" on the medications, except that she is "not as angry." (*Id.* at 55) In some cases, certain combinations of

7

medications caused sleepiness or an inability to function. (*Id.*) Other combinations made her violent or more depressed. (*Id.* at 56) She is working with Dr. Lifrak to find the right combination of medications. (*Id.* at 55) She testified that she has been seeing Dr. Lifrak once a month since 2009. (*Id.* at 57) She sees Dr. Romirowsky on an as needed basis. (*Id.*)

## 2. VE's testimony

At the hearing, the VE testified that, according to plaintiff's testimony, plaintiff has worked as a machine operator, which is unskilled and light[9] in exertion. Plaintiff also worked as a dishwasher, which the VE assessed as unskilled and at a medium[10] exertion level. The VE described plaintiff's waitressing work as light in exertion, with an SVP of 3, and semi-skilled. Plaintiff also worked at a nursing home, though not as a certified nursing

_____

[9] The Social Security regulations define light work as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

[10] The Social Security regulations define medium work as follows:

Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work.

20 C.F.R. § 404.1567(c).

8

assistant. The VE testified that this work was unskilled, medium in exertion, with an SVP of

2. (*Id.* at 50)

The ALJ posed the following hypothetical to the VE:

ALJ: . . . I'm going to ask you to consider a hypothetical individual. This is a lady who is currently 51 years old. She was more like 48/49 at onset. . . . She has a limited education in that [she] completed the 11th grade, but not high school. She can read, write and use numbers. She has the work history that you've already described and the following restrictions: In the first place, she should not have to work around ladders, scaffolds, dangerous heights or dangerous machinery. She can only occasionally stoop, crouch, crawl, squat, kneel, balance or climb stairs. I would limit lifting and carrying to 25 pounds occasionally, 10 pounds frequently. . . . [S]he can stand and walk as much as six hours in a given workday. She should not have to work around concentrated exposure to heat or cold or dust, fumes, gasses or vibrations. She has . . . some limitations in social functioning. I would say activities of daily living[, she has] a mild limitation. Socialization, she has moderate limits. Moderate limits in concentration and persistence. She has a history of at least one episode of decompensation of extended duration that is not remote.
. . .

In the first place, I would find that she can understand, remember and carry out simple, entry-level, one and two-step instructions just fine. She may have some memory problems and there are limitations in prior work, so I would limit to SVP 2 maximum complexity. She retains the capacity to concentrate and pay attention at that level of complexity for extended periods up to two hours a day.

She should have work breaks normally afforded to workers, a morning break, a lunch break, and an afternoon break. And she can stay on track with . . . the level of simple work. And she retains the capacity to perform within a schedule, be on time, produce an adequate amount of work and limit breaks to times permitted by the employer. It may take some self-prodding and some self-checking, but she retains the capacity to do that.

Other people can be distracting to the individual. She has to watch that. There are some ways to cope with it, however, she has some trouble dealing with the boss. The boss figure and authority figure can be something of a problem. Again, she has to watch it, but she is capable of working with a supervisor in the general area. I would limit contact with the general public to occasional at most.

She would have trouble dealing with changes in a work routine. That's another good reason to limit to entry-level work, to keep things simple. . . . She may have a tendency to display behavioral extremes, to get upset or perhaps, to cry a bit, be a bit tearful in the workplace, to be short-tempered or irritable. I'm limiting public contact . . . . She is capable, in hypothetical 1, of limiting extremes in behavior to what's going to work with the boss, the employer.

She may have trouble working and planning independently, so, again, I'm limiting simple work because it . . . just requires that much less need to

9

plan. Some of the jobs that were done by this claimant in the past were semi-skilled work and I'm ruling out all of that, semi-skilled work. With . . . this hypothetical, Ms. Simms, would there be any work that would be suggested? . . . [W]ould any of the job titles that were mentioned in your restriction be available?

(*Id.* at 71-74) The VE responded: "Your Honor, the work as the machine operator appears

to be unskilled and light in exertion and that would be . . . within that . . . category of work. . .

." (*Id.* at 74-75) The ALJ then asked whether there "[w]ould there be other jobs that would

be available . . . with those criteria, ma'am?"

> VE: Yes, Your Honor, I would indicate at a medium, unskilled sorter and a representative DOT number would be 769,687-058. And in the region there'd be approximately 1,100 jobs and in the national economy there'd be approximately 450,000. I'd also indicate at a medium, unskilled assembler and a representative DOT number would be 762.684-046. And in the region there'd be approximately 375,000. . . . A medium, unskilled finisher, and a representative DOT number would be 775.687-010. And in the region there'd be approximately 350 jobs and in the national economy there'd be approximately 150,000.

(*Id.* at 74-76) The ALJ then modified this hypothetical: "[W]ould any of the jobs that you just

mentioned in hypothetical 1 survive as non-public work?" [11] (*Id.* at 75-76) The VE

responded: "Yes, Your Honor, all of those jobs would be consistent with jobs that do not

require public contact." (*Id.* at 76)

The ALJ then posed a final hypothetical:

> ALJ: And then, Ms. Simms, hypothetical 3, if the hypothetical individual has marked limitations, marked deficits in either concentration or persistence, I'm going to say marked deficits in . . . socialization, the ability to get along with other people, even in a restricted area where they're not dealing closely with on a teamwork basis or a co-worker basis, with their co-workers; not dealing

---

[11] The ALJ defined "non-public work" as follows: "contact with the general public is passing, if any. No requirement to deal as a waitress would have to, for example, with the general public." (D.I. 11 at 76) The ALJ also noted that for this hypothetical she is "limiting to unskilled work and work that . . . requires no sustained, meaningful contact with co-workers or the boss other than 'hi,' 'good morning,' you sit down, but you don't have to work with them. . . . [T]he hypothetical individual should not be dependent on . . . working on a team basis or a production basis, not dependent upon another to produce or to produce herself and move product on to somebody else." (*Id.*)

10

with the general public at all; if there is still a problem with acceptable behavior, flying off the handle, making other people uncomfortable, what could be seen as discourtesy to co-workers or the boss or the general – in fleeting contact with the general public; not maintaining, on the bottom line, an acceptable standard of conduct/courtesy in the workplace, would it be likely that the hypothetical individual, with that record, would be able to sustain work in the competitive workforce, Ms. Simms?

VE: It would not be likely, Your Honor.

ALJ: If it's at the level of marked, is that correct?

VE: That is correct, Your Honor.

(*Id.* at 77-78)

On cross examination, counsel for plaintiff asked the VE whether plaintiff's expected

absenteeism — as Dr. Romirowsky opined — of more than three days per month would be

consistent with any employment. (*Id.* at 79, 349) The VE responded "that that would not be

consistent with competitive employment." (*Id.* at 79)

## D. The ALJ's Findings

Based on the factual evidence and the testimony of plaintiff and the VE, the ALJ

determined that plaintiff was not disabled during the relevant time. The ALJ's findings are

summarized as follows:[12]

1. The claimant has not engaged in substantial gainful activity since December 6, 2010, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: major depressive disorder, anxiety with PTSD (post-traumatic stress disorder) (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

_____

[12] The ALJ's rationale, which was interspersed throughout the findings, is omitted from this recitation.

4. After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform a full range of work at all exertional levels, but with substantial nonexertional limitations: she can read, write, and use numbers in the context of her prior work; should not have to work around ladders, scaffolds, dangerous heights or dangerous machinery. She can only occasionally stoop, crouch, crawl, squat, kneel, balance, or climb stairs. She can stand and walk as much as 6 hours in a work day. She should not have concentrated exposure to heat or cold, dust fumes, gasses, or vibrations. She has moderate limitations in social functioning, mild limitations in activities of daily living, moderate limits in concentration and persistence; she has sustained one episode of decomposition that is not remote. The claimant can understand, remember, and carry out simple entry level 1 and 2 step instructions; may have some memory problems, is thus limited [sic] work at SVP 2 maximum complexity. . .

5. The claimant is unable to perform any past relevant work, or has no past relevant work (20 CFR 416.965).

6. The claimant was born on July 7, 1961 and was 49 years old, which is defined as a younger individual age 18–49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since December 6, 2010, the date the application was filed (20 CFR 416.920(g)).

(*Id.* at 23-34)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive

if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Judicial

review of the ALJ's decision is limited to determining whether "substantial evidence"

supports the decision. *See Monsour Med. Ctr. v. Heckler,* 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of "evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See id.* at 250-51 (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence–particularly certain types of evidence (e.g., that offered by treating physicians)–or if it really constitutes not evidence but mere

conclusion." *See Brewster v. Heckler,* 786 F.2d 581, 584 (3d Cir.1986) (quoting *Kent v. Schweiker,* 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen,* 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel,* 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano,* 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for rehearing." *Podedworny v. Harris,* 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

Social Security Administration regulations incorporate a sequential evaluation process for determining whether a claimant is under a disability. 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the ALJ considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. Pt. 404, Subpt. P, App. 1 (1999), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the

14

impairment does not meet the criteria for a listed impairment, then the ALJ assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity[13] to perform his past work. If the claimant cannot perform her past work, then step five is to determine whether there is other work in the national economy that the claimant can perform. *Sykes v. Apfel,* 228 F.3d 259, 262-63 (3d Cir. 2000) (citing 20 C.F.R. § 404.1520). If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step. 20 C.F.R. § 404.1520(a). It is within the ALJ's sole discretion to determine whether an individual is disabled or "unable to work" under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

The ALJ is required to evaluate all of the medical findings and other evidence that supports a physician's statement that an individual is disabled. The opinion of a treating or primary physician is generally given controlling weight when evaluating the nature and severity of an individual's impairments. However, no special significance is given to the source of an opinion on other issues which are reserved to the ALJ, such as the ultimate determination of disablement. 20 C.F.R. §§ 404.1527(e)(2), (3). The ALJ has the discretion to weigh any conflicting evidence in the case record and make a determination. 20 C.F.R. §§ 404.1527(c)(2).

### B. Whether the ALJ's Decision is Supported by Substantial Evidence

Under the third step of the disability evaluation process, the ALJ found that plaintiff suffers from two severe impairments: major depressive disorder and anxiety with post-traumatic stress disorder.[14]  (D.I. 11 at 23)  This finding is not challenged on appeal.

---

[13] A claimant's residual function capacity ("RFC") is "that which an individual is able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari,* 247 F.3d 34, 40 (3d. Cir. 2001)

Accordingly, the ALJ proceeded to analyze whether these impairments met the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1. (*Id.* at 25) Specifically, plaintiff argues that her condition satisfies the requisite severity level of 12.04 ("Affective Disorders") and 12.06 ("Anxiety Related Disorders"). (*Id.* at 62-70) The required level of severity for these two listings is met if the criteria in both "paragraph A" and "paragraph B" are satisfied. At least two of the four "paragraph B" criteria must be met in order to satisfy the required level of severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(B), 12.06(B). The "paragraph B" criteria for both 12.04 and 12.06 are identical, and include:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation; each of extended duration.

*Id.* The ALJ found that plaintiff was "moderately" or "mildly" (instead of "markedly") restricted in the first three "paragraph B" criteria, and had not exhibited repeated episodes of decompensation necessary to satisfy the fourth criteria. (*Id.* at 27) Accordingly, the ALJ concluded that plaintiff suffers from severe mental impairments that neither meet nor are equivalent in severity to any listing; therefore, the ALJ proceeded to assess plaintiff's residual functional capacity. (D.I. 11 at 25) The ALJ found that plaintiff has the residual

---

[14] The ALJ conducted the "special technique" analysis used to evaluate mental impairments. 20 C.F.R. § 404.1520a(a). This technique first evaluates whether the individual has a "medically determinable impairment." *Id.* at (b)(1). Then, the Commissioner rates the degree of functional limitation. *Id.* at (b)(2), (c). There are four broad functional areas in which the Commissioner rates the degree of functional limitation: "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *Id.* at (c)(3). The Commissioner will then determine the severity of those limitations. *Id.* at (c)(4), (d). If the ALJ finds that the individual has a severe mental impairment that neither meets nor is equivalent in severity to any listing, the ALJ proceeds to assess the individual's residual functional capacity. 20 C.F.R. § 404.1520a(d)(3).

16

functional capacity to perform a full range of work at all exertional levels, but with substantial nonexertional limitations . . . ." (*Id.* at 28)

## 1. Severity requirements for Medical Listings 12.04 and 12.06

On appeal, plaintiff argues that the ALJ erred in finding that plaintiff does not meet the severity requirements for Medical Listings 12.04 and 12.06. (*Id.* at 11) Specifically, plaintiff contends that the ALJ should have found Dr. Romirowsky's testimony conclusive that her condition satisfied Medical Listing 12.04 and 12.06. Plaintiff claims that the ALJ rejected Dr. Romirowsky's testimony, and instead based her conclusion improperly upon her "own credibility judgments, speculation or lay opinion." (*Id.* at 12) (quoting *Morales*, 225 F.3d at 317-18 (3d. Cir. 2000)). Plaintiff also asserts that the ALJ placed too much emphasis on Dr. Lifrak's indication that treatment had led to some improvement in plaintiff's condition. (*Id.*)

First, with respect to a marked restriction in activities of daily living, the ALJ found that the "claimant has [a] mild restriction. She reports the ability to perform activities of daily living, personal care, and household maintenance, but primarily alleges being fearful of leaving her home." (D.I. 11 at 27) According to the Social Security regulations, "Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1). The ALJ based her finding primarily upon plaintiff's own testimony and statements. Plaintiff reported in her Disability Report that she cooks for herself daily, cleans daily without encouragement, has no issues with personal care, prefers not to go out shopping, but will on occasion, and is able to pay bills. (D.I. 11 at 245-51) At the hearing, plaintiff testified that she uses public transportation and reaffirmed that she does her own cooking, cleaning, and shopping. (*Id.* at 52) Further, the case analysis by Dr.

Suansilppongse concludes that plaintiff's daily living restrictions are only mild, rather than marked. (D.I. at 115) The court finds that substantial evidence supports the ALJ's conclusion that plaintiff did not exhibit marked restriction in activities of daily living.

Second, plaintiff argues that the ALJ erred in finding that her restriction in social functioning was only moderate. (D.I. 14 at 11) According to the Social Security regulations, "Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2). Initiating social contacts with others, communicating clearly with others, or interacting and actively participating in group activities are indicative of strength in social functioning. *Id.* Plaintiff testified that she visits her mother regularly. (D.I. 11 at 53) This testimony was corroborated by her earlier disability report. (*Id.* at 260) Plaintiff reported that she plays cards and dominos and watches television with other people on a daily basis. (*Id.* at 164) Plaintiff testified that at the time of the hearing she was living with a friend and her husband. (*Id.* at 46, 49) Plaintiff also uses public transportation. (*Id.* at 52) Plaintiff argues on appeal that her ability to engage in these sporadic activities with others does not demonstrate that she has more than a marked limitation in social functioning. (D.I. 17 at 4) However, the ALJ considered the evidence that plaintiff "has difficulty being around others, and leaving her home[,]" but nevertheless concluded that plaintiff only exhibited moderate difficulties in social functioning based on the above evidence. (D.I. 11 at 27, 30) The court finds that there is substantial evidence in the record that supports the ALJ's finding that plaintiff's restriction in social functioning was only moderate.

Third, the ALJ found that plaintiff "has experienced one episode of decompensation, of extended duration, during the period at issue." (*Id.* at 28)[15] Although plaintiff again relies on Dr. Romirowsky' testimony to challenge the ALJ's finding, he did not actually testify that plaintiff suffered from repeated episodes of decompensation. Instead, he testified that "Ms. Neal remains highly anxious, actually lives sort of on the border of decompensation on a day-to-day basis, sometimes just on the healthier side of decompensation . . . ." (D.I. 11 at 62) He did not provide testimony regarding any episodes of decompensation of the requisite duration or frequency. Thus, despite concluding that plaintiff's condition meets the necessary severity threshold, Dr. Romirowsky's specific testimony regarding this element is inconsistent with his overall conclusion. The court finds that the ALJ's decision regarding this factor is supported by substantial evidence.

Dr. Romirowsky's conclusion that plaintiff's condition meets the requisite severity level to satisfy Medical Listings 12.04 and 12.06 is not determinative. "Although [the ALJ] consider[s] opinions from medical sources on issues such as whether [claimant's] impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart . . . the final responsibility for deciding th[is] issue[] is reserved to the [ALJ]." 20 C.F.R. § 404.1527(d)(2). Thus, despite Dr. Romirowsky's testimony, the ALJ found that the evidence in the record did not establish the necessary "paragraph B" criteria. Ultimately, the ALJ concluded that "[b]ecause the claimant's mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration,

---

[15] The Social Security regulations define repeated episodes of decompensation, each of extended duration as "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4).

the 'paragraph B" criteria are not satisfied.'" (D.I. 11 at 28) The court finds that substantial evidence supports this finding[16] and the attendant determination that plaintiff's "severe mental impairment(s) . . . neither meet[] nor [are] equivalent in severity to any listing . . . ." 20 C.F.R. § 404.1520a(d)(3).

## 2. The treating physician rule

Plaintiff argues that the ALJ ignored the treating physician rule by assigning "little weight" to Dr. Romirowsky's testimony. (D.I. 14 at 13) In describing the treating physician doctrine, the court has stated that "[t]he opinion of a treating physician is given controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and it is not inconsistent with other substantial evidence in the record." *Jopson v. Astrue*, 517 F. Supp. 2d 689, 702 (D. Del. 2007). "An ALJ may only outrightly reject a treating physician's assessment based on contradictory medical evidence, not due to his or her own credibility judgments, speculation or lay opinion." *Id.* If the ALJ does not assign controlling weight to a treating physician's opinion, the ALJ must consider the factors in 20 C.F.R. § 404.1527(c)(2)-(6) to determine the weight to apply to that opinion. *Id.* These factors include: (1) the treatment relationship, including the length of the relationship and the nature and extent of the relationship; (2) supportability; (3) consistency; (4) specialization; and (5) other factors. 20 C.F.R. § 404.1527(c)(2)-(6).

The ALJ considered the treatment relationship. In this regard, the ALJ explained that Dr. Romirowsky treated plaintiff on a monthly, though inconsistent, basis from 2009 through 2011. (D.I. 11 at 26).

---

[16] Since plaintiff must demonstrate two out of the four criteria, the court need not consider the last remaining "paragraph B" criteria.

Supportability refers to whether the medical source provides relevant medical signs and laboratory findings to support his or her opinion. 20 C.F.R. § 404.1527(c)(3). The more support the source can provide for the opinion, the greater weight it deserves. *Id.* The ALJ found that Dr. Romirowsky based his testimony primarily on his brief and barely legible treatment records. (D.I. 11 at 26) She described his treatment records as "skeletal, repetitious, and not tailored to the claimant." (*Id.* at 30) The ALJ concluded that Dr. Romirowsky testified to a much broader range of issues and symptoms than the notes in his treatment records provided, thus his testimony lacked supportability.

Consistency is determined based upon whether the professional's opinion is consistent with the other evidence in the record. 20 C.F.R. § 404.1527(c)(4). The ALJ found that Dr. Romirowsky's testimony was inconsistent with the more developed treatment records of Dr. Lifrak. (D.I. 11 at 25) Dr. Lifrak's treatment notes, which provided more depth regarding plaintiff's symptoms and functionality, documented that plaintiff's condition was less severe than Dr. Romirowsky concluded at the hearing. (*Id.* at 30-31) Moreover, the ALJ again noted that Dr. Romirowsky's testimony was inconsistent with his own treatment records, which provided only a narrative of plaintiff's history, but did not support the depth of testimony he provided at the hearing. (*Id.* 25-26) Specifically, the ALJ noted that Dr. Romirowsky's testimony regarding plaintiff's functional limitations and symptoms was not corroborated by his own treatment records. *Id.*

For specialization, the ALJ found that Dr. Romirowsky was a treating psychologist, who provided psychotherapy, but coordinated his treatment with Dr. Lifrak, who provided the medical management. (*Id.* at 25) There is no finding that Dr. Romirowsky was unqualified to testify as to plaintiff's condition. The ALJ did not address any special factors at issue.

The court finds that substantial evidence supports the ALJ's decision to assign less than controlling weight to Dr. Romirowsky's testimony. Dr. Romirowsky's testimony lacked consistency and supportability. The ALJ properly considered the relevant factors in 20 C.F.R. § 404.1527(c)(2)-(6) to determine the amount of weight to assign to his testimony, and did not rely on "her own credibility judgments, speculation or lay opinion[,]" as plaintiff contends. *Jopson*, 517 F. Supp. 2d at 702.

### 3. Credibility assessment of plaintiff's testimony

Finally, plaintiff argues that the ALJ failed to properly evaluate her credibility within the RFC evaluation.[17] (D.I. 14 at 16) The ALJ concluded that plaintiff "has the residual functional capacity to perform a full range of work at all exertional levels, but with substantial nonexertional limitations . . . ." (D.I. 11 at 28) In reaching this conclusion, the ALJ adhered to a two-step process for evaluating the symptoms of plaintiff's mental impairments. (*Id.* at 29; *see* SSR 96-7p) First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms. *See* SSR 96-7p. Second, the ALJ

> must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

*Id.*

---

[17] Because the ALJ concluded that plaintiff's mental impairments neither meet nor are equivalent in severity to any listing, she proceeded to assess plaintiff's RFC. *See* 20 C.F.R. § 404.1520a(d)(3).

22

The ALJ found that there are "medically determinable impairments" that could reasonably produce plaintiff's symptoms, but plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ." (D.I. 11 at 30) Plaintiff argues that the ALJ erred in discounting her testimony. (D.I. 14 at 17) She contends that the ALJ incorrectly relied upon the lack of information provided in Dr. Rominowsky's mental health treatment notes. (Id.) Further, plaintiff claims that the ALJ drew an improper conclusion based on the fact that she had not undergone psychiatric hospitalization. (Id. at 18) Plaintiff also claims that the ALJ erred by making an adverse credibility finding because she was not on her medications at the time of the hearing. (Id.) Plaintiff cites SSR 96-7 for the proposition that an "adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide."

An ALJ must give great weight to a claimant's testimony only "when this testimony is supported by competent medical evidence," and an ALJ may "reject such claims if [s]he does not find them credible." *Schaudeck v. Commissioner of Soc. Sec.*, 181 F.3d 429, 433 (3d Cir. 1999). The ALJ "has the right, as the fact finder, to reject partially, or even entirely, such subjective complaints if they are not fully credible." *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974).

First, the ALJ found that Dr. Romirowsky's treatment notes do not corroborate plaintiff's complaints of her subjective symptoms. (D.I. 11 at 30) Plaintiff argues that the lack of detail in Dr. Rominowsky's treatment notes should not affect her credibility. However, an ALJ can decrease the weight assigned to a claimant's testimony if it is not

23

supported by competent medical evidence. *See Schaudeck*, 181 F.3d 433.[18] Second, the

ALJ detailed several inconsistencies among plaintiff's testimony and recorded statements.

(D.I. 11 at 30) The ALJ found that while plaintiff on one hand testified that she was "afraid

to leave the house," she also testified that she "gets around by public transportation" and

"likes to take her friend's dog to the park." (*Id.*) The ALJ explained that plaintiff claimed that

she could not afford her medication, but later testified that she had a medical card that

covered almost all of the cost of that medication. (*Id.*) Plaintiff testified that she had been

working with Dr. Lifrak to find the right balance of medication, but also testified that she had

not been actually taking her medication for three months prior to the hearing. (*Id.*)

With respect to these findings, plaintiff argues that the "Third Circuit has downplayed

the significance of minimal activities performed by a claimant as evidence that can refute

credible medical evidence of disability." (D.I. 14 at 18) (citing *Frankenfield v. Bowen*, 861

F.2d 405, 408 (3rd Cir. 1988)). However, plaintiff misapplies *Frankenfield*. The ALJ did not

cite plaintiff's activities in order to refute credible medical evidence of disability; rather, she

highlighted these activities as evidence of the inconsistencies in plaintiff's testimony.

Furthermore, the ALJ did not improperly draw an adverse credibility determination because

plaintiff was not taking her medication, as plaintiff contends. Instead, the ALJ drew the

adverse credibility determination based of plaintiff's inconsistent testimony regarding

aspects of her treatment regimen, as detailed above. The ALJ did not err in finding that

---

[18] In her brief, plaintiff quotes *Brownawell v. Astrue*, 554 F.3d 352, 356 (3d Cir. 2008) to support her argument that lack of detail in treatment notes should not affect a claimant's credibility determination. (D.I. 14 at 17) Plaintiff misrepresents the context of that case; in *Brownawell*, the Court explained that it was improper for the ALJ to discredit a treating physician based on purportedly inconsistent treatment reports, because those reports assessed the claimant at different times and in different settings, and thus were not necessarily inconsistent. *Brownawell*, 554 F.3d at 356. Conversely, here, Dr. Romirowsky's treatment notes repeatedly failed to support many of the subjective symptoms that plaintiff claimed at the hearing.

these inconsistencies negatively impacted plaintiff's credibility. The court finds that there is substantial evidence supporting the ALJ's finding that plaintiff's testimony was "not entirely credible." (*Id.*)

The ALJ considered all the relevant evidence and adequately discussed the bases for her determination. The court concludes that a careful review of the entire record provides substantial evidence, sufficient to support the ALJ's finding that plaintiff could perform a full range of work at all exertional levels, but with substantial non-exertional limitations, and that jobs existed in significant numbers in the national economy that she could have performed, and that she was not disabled as of December 6, 2010.

## V. CONCLUSION

For the reasons stated, plaintiff's motion for summary judgment will be denied and defendant's motion for summary judgment will be granted. An appropriate order shall issue.